NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.C.

No. 1 CA-JV 23-0035
FILED 2-27-2024

---

Appeal from the Superior Court in Maricopa County
No. JD41139
The Honorable Robert Ian Brooks, Judge

## ORDER STAYING THE APPEAL AND REVESTING JURISDICTION IN THE SUPERIOR COURT FOR A LIMITED PURPOSE AND FOR A LIMITED TIME

---

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Bailey Leo
*Counsel for Appellee Department of Child Safety*

---

**ORDER**

---

Presiding Judge Michael J. Brown issued the order of the Court, in which Chief Judge David B. Gass joined. Judge Andrew M. Jacobs dissented.

---

**B R O W N**, Judge:

**¶1**   The court has determined it would benefit from clarification from the superior court judge who granted the Department of Child Safety's motion to terminate mother's parental rights as to the child. *See* Ariz. R. Juv. Ct. P. 608 (b)(4) ("The appellate court may . . . take other actions the court deems just and proper under the circumstances, including suspending the appeal and revesting jurisdiction in the juvenile court for further proceedings in that court.").

**¶2**   In its order granting the termination motion, the superior court noted mother regularly asked "to be advised of [the child's] medical appointments so that she could participate in those appointments and understand the child's medical needs better." Even so, as the superior court found, "[t]he Department never advised [m]other of the child's medical appointments."

**¶3**   For that reason, the superior court "considered whether the Department's failure to provide this notice rendered their efforts less than diligent and unreasonable." The superior court found "that even if the Department had provided [m]other with the dates of those appointments, it would not have moved Mother closer to reunification and would have been futile." The superior court then found it "unlikely that [m]other would have participated" even if the Department had given her notice and "[m]other had abundant access to the child's medical history and records and—based on her own testimony—still had no idea what the child's various medical needs were as of the date of trial." The superior court went on: "[T]he Department did provide many services, and [m]other simply failed to take advantage of many options to learn about her child's needs."

**¶4**   In ruling on the Department's motion to terminate, the superior recognized "[t]he burden to provide services is always on the Department." But the superior court did not articulate the burden of proof it applied to find "that even if the Department had provided [m]other with

the dates of those appointments, it would not have moved Mother closer to reunification and would have been futile."

¶5        **IT THEREFORE IS ORDERED** staying this appeal until March 28, 2024, and remanding jurisdiction to the superior court judge who presided over the termination adjudication to issue a minute entry in this matter answering the following question based on the record established at the termination adjudication:

> What burden of proof did the superior court apply to find "even if the Department had provided [m]other with the dates of those appointments, it would not have moved [m]other closer to reunification and would have been futile"?

¶6        **IT IS FURTHER ORDERED** directing the clerk of the superior court to transmit a certified copy of the minute entry the superior court issues in response to the above order to this court by March 27, 2024.

¶7        **IT IS FURTHER ORDERED** lifting the stay automatically on this court's receipt of the minute entry the superior court issues in response to the above order, but no later than March 28, 2024.

¶8        **IT IS FURTHER ORDERED** directing the clerk of the court to send a copy of this order to the Honorable Robert Brooks and another to the Clerk of the Maricopa County Superior Court.

¶9        Though formatted as a memorandum decision, this is an order that does not dispose of any aspect of the case or resolve the appeal. This order simply stays the appeal for thirty days and revests jurisdiction in the superior court for that time for a limited purpose. This court retains appellate jurisdiction until it issues a disposition on the merits and subsequent mandate as defined by Arizona Rule of Civil Appellate Procedure 24(a). The majority, at the request of the dissenting judge, have agreed to file this order in a memorandum-decision format, but the majority does not opine on the legal justification for doing so. The panel will issue a substantive disposition together with any substantive concurring or dissenting expression in due course. The majority does not comment on the dissent's procedural or substantive analysis of the case in this order.

**J A C O B S, J.**, dissenting.

**¶10** I respectfully dissent from the panel's order remanding this case in part to the juvenile court judge[1] who issued the termination order to confirm whether the court applied the clear and convincing evidence standard when determining it would have been futile for DCS to give Mother notice of her now three-year-old child J.C.'s medical appointments.

**¶11** First and foremost, the remand asks a legally irrelevant question. We should find futility is not a permissible basis to terminate Mother's parental rights, for reasons including that as applied to Mother in this case it violates her constitutional rights under *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982), while effecting an end run around the process the legislature conferred on Mother in A.R.S. § 8-846(D). *See generally below, and* Paragraphs 53-59. For this reason, the question of whether it was shown by clear and convincing evidence is irrelevant as a matter of law.

**¶12** Second, if one treats the question as relevant, then remanding is error because we presume a juvenile court finds the grounds for termination by clear and convincing evidence. A.R.S. § 8-537(B) ("The court's findings with respect for grounds of termination shall be based on clear and convincing evidence . . ."); *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 94 ¶ 6 (App. 2009) (explaining "the requisite standard of proof is inherent in a court's finding."). We don't remand when the court omits to restate the required legal standard, as the panel does today; we presume the court made the necessary findings and affirm. *See Cassandra S. v. Dep't of Child Safety*, No. 1 CA-JV 21-0003, 2021 WL 2434266 ¶ 15 (Ariz. App. June 15, 2021) ("By ordering Mother's parental rights terminated based on 15-months' time-in-care, the court necessarily found by clear and convincing evidence that she was unable to remedy her substance abuse.") If futility is a ground for termination, it is unclear why the panel chooses not to presume the juvenile court found it by clear and convincing evidence. Rather than delay this year-old juvenile appeal, we should adhere to our ordinary decisional practices, and decide it now. *See* A.R.S. § 8-235(C) (directing this court to give appeals from juvenile court orders "precedence over all other actions except extraordinary writs or special actions.")

**¶13** Third, remanding here is incorrect because the juvenile court's finding of futility cannot be cured of error by the question the remand poses. The termination order's conclusion of futility is premised

---

[1] The judge rotated from service on the juvenile court in June 2023.

on its factual finding that it would be "unlikely" Mother would have attended J.C.'s medical appointments. But finding something "unlikely" doesn't show "by clear and convincing evidence" it wouldn't happen, because "clear and convincing" means "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz 279, 284-85 ¶ 25 (2005). Mere likelihood doesn't ring that bell. So inviting the juvenile court on remand to state by order that it really found everything necessary for termination by the right legal standard – when the court as trier of fact already found a fact necessary to that conclusion to be merely "unlikely" – changes nothing.

¶14 Fourth, the criteria that guide our discretion in reviewing special actions should also lead us not to remand today. While those criteria are not systematically stated in present law, they are proposed to be codified by the Arizona Supreme Court's Task Force on Rules of Procedure for Special Actions and they shed light on what we should do here. *See* Petition to Amend the Rules of Procedure for Special Actions, Pet. No. R-23-0055, at Attachment A, Proposed Rules, at Proposed Rule 11, Factors for Accepting or Declining Jurisdiction of Appellate Special Actions, available at https://www.azcourts.gov/Rules-Forum/aft/1523#8466 (last visited February 23, 2024).

¶15 This proposed codification of our discretionary review practices suggests we should exercise our discretion to determine matters in the interests of efficient case management. *See id.*, at Proposed Rule 11(b)(7) (directing courts to consider whether resolution of issue "will materially advance the efficient management of the case"). It is not efficient to remand to modify a year-old order on appeal after extensive consideration. The proposed rules, like our statutory law and case law, suggest we prioritize the welfare of children. *See id.*, at Proposed Rule 11(b)(6) (directing courts to consider the welfare of children and whether review is urgently necessary to resolve harm to child). Deciding this appeal based on the juvenile court's February 3, 2023, order rather than a modified target, would better serve that goal. And the proposed rules suggest deciding matters that tend to evade review, including questions that may become moot. *See id.*, at Proposed Rule 11(b)(5) The order's effect is to create the possibility that issues already posed, argued, and analyzed may evade review. These issues are ripe for determination. Prudence and discretion dictate that we should decide them now.

¶16 To further explain Paragraph 10, *above*, the dissent reviews the record and controlling law to state how this appeal should now be resolved.

**INTRODUCTION**

¶17 The mother of the child J.C. appeals the juvenile court's order terminating her parental rights substantially because she cannot care for J.C.'s special medical needs. DCS sought and obtained an order terminating Mother's parental rights despite the court's findings that: (1) DCS failed to ever invite Mother to one of J.C.'s medical appointments; and (2) Mother regularly requested to be kept advised of those appointments so she could attend and learn to better understand J.C.'s medical needs. The court terminated Mother's parental rights in part because the court found it would have been "futile" to provide Mother with the services she requested, despite their being core to the termination of her parental rights. On the facts the court found, the termination violates Mother's constitutional rights to due process set forth in *Santosky*, 455 U.S. at 753–54, and explained in *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 8 (2021). This court should vacate the order terminating Mother's parental rights and remand for her to have the chance to try to attend J.C.'s medical appointments to learn to care for her child's special medical needs.

**FACTS AND PROCEDURAL HISTORY**

A. **After a Report That Mother Was Unable to Meet J.C.'s Special Medical Needs, DCS Made a Plan That Mother Would Learn to Meet J.C.'s Needs By Attending Medical Appointments to Better Understand Them.**

¶18 J.C. was born with several medical issues in part because of a condition afflicting Mother that she had failed to treat. Mother also exposed J.C. to marijuana *in utero*. In October 2020, J.C. was born below average weight and failed to thrive, partially because Mother was not feeding her properly or timely. At that time, Mother failed to follow up with the infant's doctor appointments and therapy assessments. Mother, then 19 years old, faced her own mental health issues, including attention-deficit hyperactivity, depression, and anxiety disorders.

¶19 DCS's intervention in Mother's relationship with J.C. began on February 4, 2021, when "the Department received a report that Mother was unable to medically care for her child." DCS implemented an in-home safety plan in which a relative was to supervise Mother's parenting. DCS's plan recognized that the "[s]ervices and behavioral changes [Mother] needed" to make the plan work included Mother consistently attending J.C.'s medical appointments. Indeed, DCS's plan called for "[Mother to] makes sure that [J.C.] makes it to all of her medical appointments**."** From that constant attendance, Mother would come to understand and meet each

of J.C.'s medical and special needs, so she could "demonstrate the[se] learned skills during visitation with" J.C. DCS called Mother's presence in and learning from the medical appointments a condition necessary for her to demonstrate effective parenting and reclaim her full parental rights. It wrote in a later report to the juvenile court that Mother's "Behavior Change Goal Needs" included Mother being "able to identify how her . . . lack of engagement in J.C.'s medical appointments has effected [sic] [J.C.]".

¶20 DCS referred Mother to services to help her parent, in which Mother inconsistently participated at first. Mother received therapy and medication monitoring through Chicanos Por La Causa and services through Family Connections, including a care coordinator, dietician, pediatrician, gastrointestinal doctor, and a home health nurse assigned to support her in caring for J.C. Mother struggled with properly feeding J.C. and following up with her medical needs. Around then, J.C. weighed in the first percentile on the growth charts.

¶21 Mother's inconsistent participation in her own counseling continued, and she struggled with feeding J.C. By January 2021, J.C. had been hospitalized seven times for failure to thrive and often required a feeding tube in the hospital. J.C. gained weight during her hospital stays but lost weight at home in Mother's care. Meanwhile, Mother struggled with depression and self-harm urges. Mother's provider recommended counseling at least once a month, but she attended sessions inconsistently and eventually stopped attending altogether. In July 2021, J.C. was hospitalized again. Mother stayed with J.C. in the hospital, but could not meet the infant's needs. Hospital staff frequently had to wake Mother up to feed J.C. and, at times, they could not wake her, so they cared for J.C. themselves. Mother also failed to give J.C. medication for two infections, causing one to persist for months. Because J.C. was failing to thrive, she started missing developmental milestones and experiencing progressive vision and hearing loss. DCS felt Mother's inability to keep J.C. fed and growing could lead to grave harm if not ameliorated.

**B. DCS Asked the Court to Declare J.C. Dependent, Relying Substantially on Mother's Inability to Meet J.C.'s Specialized Medical Needs, But Did Not Invite Her to Any of J.C.'s Medical Appointments.**

¶22 On July 23, 2021, DCS petitioned the juvenile court to declare J.C. dependent, in substance because Mother was not then able to provide for J.C.'s special medical needs. DCS's dependency motion was substantially premised on "Mother [being] unwilling or unable to provide proper and effective parental care and control by neglecting to provide

proper and effective parental care and control by neglecting to provide for the child's nutrition and medical care." The first half of DCS's explanation in the petition as to why Mother's continued care of J.C. would be contrary to her welfare consisted of discussions of Mother's inability to care for J.C.'s special medical needs. DCS's petition criticized Mother's parenting abilities by noting her need to better follow medical instructions of a dietitian, a pediatrician, medical staff, a primary care physician, and hospital staff.

¶23 DCS kept the focus for Mother's improvement on her ability to improve in handling J.C.'s special medical needs. In a report to the juvenile court dated December 3, 2021, DCS's list of changes Mother needed to make repeatedly called out the need to assure that J.C.'s special medical needs would be met. The report opined that Mother must "utilize[] her resources to assist in ensuring [J.C.'s] medical and basic needs are met . . . ." In a later paragraph on the same page, DCS reported that Mother must "understand[] her child's medical needs and [be] equipped to provide and follow through with any and all medical recommendations. [Mother must] understand[] what is needed to continue with [J.C.'s] medical appointments to ensure [J.C.'s] safety and development." In a third separate paragraph on that page, DCS wrote that Mother needed to be able to "articulate the importance of being involved in [J.C.'s] medical needs and . . . not allow a lapse in attending [J.C.'s] medical appointments." As DCS wrote, these improvements were all "necessary in order for the parent . . . to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as designed in the case plan)."

¶24 Notwithstanding how central J.C.'s special medical needs were to her dependency, and the acknowledged necessity for Mother to attend all of J.C.'s medical appointments, DCS never invited Mother to any of J.C.'s medical appointments.

## C. DCS Urged Mother to Address Her Emotional and Substance Use Issues Through Services During the Dependency, Which Mother Did With Limited Success.

¶25 Aside from directly addressing J.C.'s special medical needs, DCS's case plan also focused on Mother's mental health issues and use of substances, calling for Mother to engage in services to alleviate those concerns as an aid to her care for J.C. Early in the case plan, Mother admitted that she felt she needed someone there with her every step of the way to take care of J.C. and that parenting was too overwhelming for her.

¶26 DCS offered Mother Family Connections services and referred Mother for a psychological evaluation, the Nurturing Parenting

Program, drug testing, and supervised visitation. Over the next year-and-a-half, Mother engaged in some of these services. For example, in April 2022, Mother began therapy through a new service provider, but only attended six appointments over the months before trial. While originally poor, Mother's engagement in services improved substantially shortly before her termination trial.

¶27 During the dependency, DCS was concerned about Mother's drug use. In March 2022, Mother tested positive for methamphetamine and continued to use marijuana for her anxiety and depression and stress. Though Mother had a medical marijuana card, DCS questioned her marijuana use considering J.C.'s extreme vulnerability and instances of Mother falling asleep while caring for the child, including at supervised visits. DCS referred Mother to Terros for substance-abuse and mental-health treatment. Terros recommended Mother participate in individual, group, and Medical Marijuana Group therapy and drug testing. Mother minimally attended, however, and her referral closed.

¶28 In August 2022, Mother told DCS she was still struggling with depression, so the case manager referred her for a second psychological evaluation. The psychologist recommended she participate in substance-abuse testing and treatment and establish sobriety for at least six months. Mother did not complete the resulting Terros intake before trial. Mother continued to use marijuana (albeit legally) for her anxiety and depression up to trial. The psychologist also recommended Mother engage in the Nurturing Parenting Program. Mother was halfway through the Nurturing Parenting Program by trial.

¶29 Meanwhile, J.C. improved in the care of her foster family but still had significant special needs, including feeding, speech, physical, and occupational therapies, medical appointments, and behavioral-health services. Doctors determined that J.C. was partially deaf and required hearing aids and speech and hearing services. In September 2021, DCS approved J.C.'s aunt and uncle for unsupervised visits and allowed Mother to attend these visits. Mother did not join them in these extra visits. However, when J.C.'s aunt and uncle and foster family invited Mother to a handful of the child's medical appointments, Mother attended a few of them. A DCS specialist commented unfavorably on Mother attributing her difficulties in engaging with services to her work schedule, and criticized Mother for failing to pursue sign-language learning while J.C.'s foster family had.

¶30 When it later denied termination on the six-months out-of-home care ground, the court would find that Mother "ha[d] not

substantially neglected or willfully refused to participate in services, given her recent engagement."

> **D.** **The Court Terminated Mother's Parental Rights For Neglect and Under the Fifteen-Month-in-Care Ground, Excusing DCS's Failure to Invite Mother to J.C.'s Appointments Because It Would Have Been "Futile" to Do So.**

**¶31** On August 29, 2022, DCS moved to terminate Mother's parental rights under the neglect and six-month and fifteen-month out-of-home placement grounds. *See* A.R.S. § 8-533(B)(2), (B)(8)(b)-(c). The court held an evidentiary hearing across two days, December 13, 2022, and January 11, 2023, before granting the motion to terminate on two of those three grounds in an Under Advisement Ruling on February 3, 2023.

**¶32** Before analyzing the grounds for termination in its Under Advisement Ruling, the court made findings about DCS's failure to provide reunification assistance to Mother. The court found that "The Department never advised Mother of the child's medical appointments." The court further found that "Mother at hearings and foster care review board meetings regularly requested to be advised of medical appointments so that she could participate in those appointments and understand the child's medical needs better." The court found these facts irrelevant to its decision to terminate Mother's parental rights with respect to J.C., because the court found that "even if the Department had provided Mother with the dates of those appointments, it would not have moved Mother closer to reunification and would have been futile." The court did not find DCS excused from providing medical appointment-related services to Mother under any of the statutory grounds under A.R.S. § 8-846, nor did the court find that informing Mother of the medical appointments would be "futile" by clear and convincing evidence. Rather, by finding it "unlikely" Mother would have participated in J.C.'s medical appointments, the court found DCS's failure not to invite Mother proper by something more akin to a preponderance of the evidence standard, and thus expressly not by clear and convincing evidence.

**¶33** The court ruled that DCS had proven there was a basis to terminate for neglect under A.R.S. § 8-533(B)(2) because it found Mother would not be able "to meet [J.C.'s] medical needs." The court found Mother "did not provide the Child with needed medical care, including obtaining prescriptions, providing appropriate medicines, or learning how to address the Child's particular feeding needs." The court found "Mother is currently unable to meet those medical needs and will continue to be unable to meet

those needs" for reasons including Mother's "failure to stay up to date in the child's medical needs . . . ."

¶34 The court denied DCS's motion to terminate under A.R.S. § 8-533(B)(8)(b), the six-month out-of-home placement ground. The court found DCS had made diligent efforts to provide services, including therapy for emotional difficulties, parenting coaching, and substance use-related counseling. As noted, recognizing "Mother's more recent engagement" in services, the court found Mother had "not substantially neglected or willfully refused to participate in services," and thus declined to terminate on this basis.

¶35 The court found DCS had proved by clear and convincing evidence that A.R.S. § 8-533(B)(8)(b), the fifteen-month out-of-home placement ground, justified termination. The court repeated its finding that DCS had made diligent efforts to provide services that, if successfully completed, would likely have resulted in reunification. The court found Mother "does not recognize her child's special and medical needs, and ha[d] taken minimal steps to understand those needs or how to best address them." The court emphasized that Mother's marijuana use had impaired her caregiving and that she continued to use marijuana until just before trial (though apparently legally). Based on Mother's degree of participation in services, the court found that Mother did not know how to care for her child's "basic or special medical needs" and would not be able to provide proper parental care in the near future.

¶36 Finally, the court addressed whether it was in J.C.'s best interests to terminate Mother's parental rights. The court found that Mother had "relatively improved parenting skills," "ha[d] made some progress in her ability to interact with her child, and [wa]s clearly bonded." The court found "[t]here is no question that Mother loves her child." Despite those findings, the court found J.C. had a foster home "where all of her medical needs can be appropriately provided for," while "Mother has never been able to and will not be able to" provide for J.C.'s medical needs. The court concluded its decision as one resting on Mother's understanding of J.C.'s medical needs – "[w]hile Mother has had some skills improve, her ability to care for the Child's medical needs have not increased at all." Because of this failure to understand and address medical needs, the court found it in J.C.'s best interests by the preponderance of the evidence to terminate Mother's parental rights.

¶37 Mother appealed. This court has jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶38**         Mother challenges the superior court's determination that DCS made a diligent effort to provide her with appropriate reunification services, given the court's findings that DCS never advised her of J.C.'s medical appointments and that she regularly requested to be kept apprised of them so she could better understand J.C.'s special medical needs. Mother argues that DCS was constitutionally required to make a diligent effort to provide her with reunification services even with respect to its effort to terminate her parental rights under A.R.S. § 8-533(B)(2). Mother also challenges that severance was in J.C.'s best interests because, she contends, a correct analysis of the totality of the circumstances would account for DCS's failure to assist her in learning about J.C.'s special medical needs.

**¶39**         DCS argues there is no federal constitutional requirement to diligently support reunification when it alleges abandonment, and that our Legislature's omission from A.R.S. § 8-533(B)(2) of any requirement to provide reunification services is fatal to Mother's position. In any event, DCS argues, the court was right to apply the futility doctrine to reject her complaint about DCS's failure to ever invite Mother to J.C.'s medical appointments. Inviting Mother to J.C.'s medical appointments would have been futile because, DCS claims, Mother failed to engage in any services and never attended any service appointments. Finally, DCS contends Mother failed to challenge the factual premises of the court's best interests finding. We should reject these arguments and vacate the order terminating Mother's parental rights.

I.         **Terminating Mother's Right to Parent J.C. For Failure to Provide for J.C.'s Medical Needs, While Refusing to Invite Mother to J.C.'s Medical Appointments Even as She Continually Asked to Attend Them, Violated Mother's Constitutional Rights.**

        A.         **The Constitutional Right to Parent Is Fundamental and May Only Be Terminated Where Fundamentally Fair Procedures Provide Due Process, Including Reunification Services.**

**¶40**         Parents have a "fundamental liberty interest in 'the care, custody, and management' of their children" grounded in the United States Constitution. *Jessie D.*, 251 Ariz. at 579 ¶ 8 (quoting *Santosky*, 455 U.S. at 753). As the Arizona Supreme Court has reminded us, "it is crucial to remember that parents' right to the custody and control of their children is fundamental and 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state.'" *Id.* at 581 ¶ 17 (quoting *Santosky*, 455 U.S. at 753). Thus, "the court [should]

12

sever the parent-child relationship only in the most extraordinary circumstances, *when all other efforts to preserve the relationship have failed*." *See id.* at ¶ 18 (quoting *In re Appeal in Maricopa Cnty. Juv. Act. No. JA 33794*, 171 Ariz. 90, 91-92 (App. 1991)) (Arizona Supreme Court's emphasis). Our Supreme Court called reunification services "imperative," and made clear DCS is constitutionally required to offer reunification services when it seeks to terminate parental rights. *Id.* In particular, the Court approvingly stated that "Arizona courts have previously recognized a requirement to engage in reunification efforts on constitutional grounds as *a necessary element of any state attempt* to overcome . . . the fundamental liberty interest of the natural parents in the care, custody and management of their child." *Id.* (quoting *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 29 (App. 1999)) (emphasis added) (cleaned up). In other words, all parents hold these constitutional rights, and they do not vanish based upon DCS's choice to proceed under one statutory basis rather than another in seeking to overcome a parent's liberty interest.

¶41        Nevertheless, a parent's right to custody and control of her own child, while fundamental, is not inalienable. *Id.* at 579 ¶ 8. The court may terminate parental rights where "the parents whose rights are to be severed are provided with fundamentally fair procedures that satisfy due process requirements." *Id.* (quoting *Kent K.*, 210 Ariz. at 284 ¶ 24) (cleaned up). In a proceeding meeting due process strictures, terminating a parental relationship may be warranted where DCS proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K.*, 210 Ariz. at 284-85 ¶ 25. The court must also find that severance is in the child's best interest by a preponderance of the evidence. *Id.* at 284 ¶ 22.

> **B.  The Key Issue of J.C.'s Dependency and the Court's Termination Order Was Mother's Ability to Learn About J.C.'s Special Medical Needs to Enable Her to Fulfill Them.**

¶42        Mother lost her parental rights because the superior court agreed with DCS that Mother did not understand, and would not learn to fulfill, J.C.'s special medical needs. DCS's intervention here began when "the Department received a report that Mother was unable to medically care for her child." DCS's petition to declare J.C. dependent focused principally on whether Mother could meet J.C.'s special medical needs, and comply with the advice and instruction of an array of medical professionals DCS cited.

¶43        When reporting to the juvenile court, DCS made the centerpiece of its plan for Mother's necessary improvement that she appreciate J.C.'s medical needs, understand her need to support them, get J.C. to medical appointments, and never lapse in being present herself for the appointments.  DCS declared these improvements all "necessary in order for [Mother] . . . to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as designed in the case plan)."  In other words, to prevail, Mother had to attend all of J.C.'s medical appointments to learn more about her medical conditions and make sure J.C.'s special needs were met.

¶44        The superior court's order of termination likewise made clear Mother's inability to improve in understanding J.C.'s medical needs was the but-for cause of termination in four ways.  First, recognizing that some or all of the grounds for termination in this matter required DCS to diligently provide Mother with reunification services, the superior court's analysis began with the finding that inviting Mother to J.C.'s medical appointments would have been futile because it was "unlikely" she would have attended the appointments.  Second, the superior court found neglect proved under A.R.S. § 8-533(B)(2) because of Mother's inability to understand J.C.'s special medical needs, which in turn was demonstrated because Mother had "fail[ed] to stay up to date in the child's medical needs . . . ."  Third, the court found A.R.S. § 8-533(B)(8)(b), the fifteen-month out-of-home placement ground, proven in part because Mother "does not recognize her child's special and medical needs, and ha[d] taken minimal steps to understand those needs or how to best address them."  Fourth, in defining J.C.'s best interests, the court allowed that Mother greatly loved J.C., and was bonded to J.C., and had made improvements in her parenting skills, but found that "her ability to care for the Child's medical needs have not increased at all."

      **C.**     **Because Understanding J.C.'s Special Medical Needs Was the Centerpiece of the Case Plan and Termination Proceeding, DCS Needed to Give Mother a Chance to Attend J.C.'s Medical Appointments.**

¶45        DCS conditioned reunification on Mother's ability to understand and meet the child's medical and special needs. DCS expected Mother to consistently attend J.C.'s medical and therapy appointments. Indeed, DCS set up Mother's attendance itself as a criterion for Mother's success or failure in making the improvements needed to reclaim her full parental rights.  Paradoxically, DCS made no efforts to invite Mother to those very appointments, leading the superior court to find DCS "never advised Mother of the child's medical appointments."  We defer to this

finding of fact. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002) (explaining that we "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings . . . ."). We likewise defer to the superior court's finding that Mother recurringly sought to be invited to these appointments so she could learn to better understand J.C.'s medical needs. *Id.* In any event, DCS does not directly challenge these findings of fact on appeal, and we accept their veracity.

¶46     Mother argues this failure was a violation of due process. She is right. It is essential that if DCS conditions reunification on a parent's ability to meet her child's medical needs, it must manage the case to give adequate notice to the parent of the child's medical and therapy appointments and allow her the opportunity to attend them. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 50 (App. 2019) ("Although what constitutes a diligent effort will vary by case based on the family's unique circumstances, a diligent effort requires—at the least—DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult.").

¶47     One of our cases upon which DCS relies in making its futility argument makes this point eloquently. In *Mary Ellen C.*, this court reversed a termination of parental rights premised on the mental illness of a mother where DCS's expert had recommended "intensive psychiatric services" that the mother did not receive before her rights were nonetheless terminated. 193 Ariz. at 192 ¶¶ 34-37. As we explained while reversing that termination in *Mary Ellen C.*, "[t]he State does not . . . make a 'concerted effort to preserve' the parent-child relationship when it neglects to offer the very services that its consulting expert recommends." *Id.* at 192 ¶ 37.

¶48     A similar logic controls here. This termination came down to whether Mother could learn to address J.C.'s special medical needs, just as the termination in *Mary Ellen C.* was a function of whether the mother could overcome her "serious mental illness." *Id.* at 192 ¶¶ 35-37. Just as DCS's failure to provide Mother with the "intensive psychiatric services" that were that mother's chance to address her mental health struggles required reversal in *Mary Ellen C.*, so is DCS's failure to notify Mother of any of J.C.'s appointments a violation of Mother's constitutional rights. Terminating Mother's parental rights despite the lack of any effort to provide the service core to this judicial proceeding failed to provide Mother with the fundamentally fair procedure and due process our Constitution guarantees her in "any state attempt to overcome . . . the fundamental liberty interest"

in parenting one's child. *Jessie D.*, 251 Ariz. at 581 ¶ 18 (quoting *Mary Ellen C.*, 193 Ariz. at 192 ¶ 29) (emphasis added) (cleaned up).

**D.** *Jessie D.* **Forecloses DCS's Argument That There Is No Constitutional Requirement of Diligent Efforts to Reunify Where DCS Seeks Termination Under A.R.S. § 8-533(B)(2).**

**¶49** DCS argues that there is no federal constitutional requirement of efforts to reunify when termination under A.R.S. § 8-533(B)(2) is at issue. The critical passage of *Jessie D.* just discussed resolves that argument.

**¶50** First, DCS is right that the Legislature omitted to include a requirement of diligent efforts before termination in A.R.S. § 8-533(B)(2) – but the Legislature also omitted that requirement from A.R.S. § 8-533(B)(4), and the Arizona Supreme Court found those efforts constitutionally required. *See Jessie D.*, 251 Ariz. at 581 ¶ 18 ("Although A.R.S. § 8-533(B)(4) does not impose an explicit duty on DCS to provide reunification services, the absence of a statutory duty does not obviate the state's obligation to provide those services.").

**¶51** Second, our Supreme Court made clear that this logic extends to "*any state attempt* to overcome . . . the fundamental liberty interest of the natural parents in the care, custody, and management of third child." *Id.* (emphasis added) (cleaned up). Far from "read[ing] such a requirement into the neglect and abuse ground," as DCS's brief would have it, this position follows *Santosky* as applied to A.R.S. § 8-533(B) by our Supreme Court.

**¶52** Third, *Alma S v. Dep't of Child Safety*, 245 Ariz. 146 (2018), which DCS cites, is not to the contrary. There, our Supreme Court considered what "inquiry juvenile courts must make to determine whether parental severance is in the 'best interests of the child' for purposes of A.R.S. § 8-533(B)." *Id.* at 148 ¶ 1. The thrust of *Alma S.* is how to conduct a best-interests determination, not construing which subsections of A.R.S. § 8-533(B) require DCS to make diligent efforts toward reunification. *See generally id.* We appreciate and take the guidance from *Alma S.*, cited by DCS, that eight of the eleven statutory grounds in A.R.S. § 8-533(B) are synonymous with unfitness. 245 Ariz. at 150 ¶¶ 9-10 (referring to A.R.S. § 8-533(B)(1)-(4), (8)-(11)). But DCS's entirely correct observation is an unavailing bootstrap because it begs the question before us. Before a finding of any of the statutory grounds in A.R.S. § 8-533(B) (which are indeed synonymous with unfitness), the court must first employ procedures consistent with due process and fundamental fairness. *Jessie D.*, 251 Ariz. at 579 ¶ 8 (citing *Kent K.*, 210 Ariz. at 284 ¶ 24). *Jessie D.*, which

came three years after *Alma S.*, made clear that even though a finding of eight of the eleven statutory grounds in A.R.S. § 8-533(B) equate to a finding of unfitness, our courts cannot make a finding of unfitness under its subparts without first requiring a finding of diligent efforts by DCS. *Id.* at 581 ¶ 18.

**¶53**     In sum, *Jessie D.* requires us to hold that the lack of any effort by DCS to invite Mother to J.C.'s medical appointments, much less a diligent effort, violates her constitutional right to due process.

## II.     The Superior Court's Finding of Futility Does Not Justify Termination of Mother's Parental Rights or Cure the Violation of Due Process in That Termination.

**¶54**     DCS separately contends that the superior court properly found that it was harmless that DCS failed to ever notify Mother of J.C.'s medical appointments because any such invitation would have been futile. A number of cases from this court explain that DCS's obligation to provide rehabilitative measures to parents in termination proceedings does not include an obligation to undertake futile measures. *See, e.g.*, *Mary Ellen C.*, 193 Ariz. at 192 ¶ 34; *Maricopa Cnty. Juv. Action No. JS-5209 & No. JS-4963*, 143 Ariz. 178, 189 (App. 1984). DCS's argument that futility defeats Mother's due process right to some efforts by DCS to include her in J.C.'s medical appointments fails for constitutional, legal, and factual reasons.

### A.     The Court's Finding of Futility Cannot Defeat Mother's Constitutional Right to Diligent Efforts.

**¶55**     *Jessie D.* makes clear DCS's invocation of futility cannot overcome Mother's constitutional right to diligent efforts, which must encompass invitations to J.C.'s medical appointments to have any meaning. In *Jessie D.*, the Arizona Supreme Court reversed the superior court's determination that DCS did not need to provide requested rehabilitative services to a father in prison facing termination under A.R.S. § 8-533(B)(4) because the superior court found it would be "virtually, if not completely, impossible in a prison setting" for the father "to build and maintain a bond" with his children. 251 Ariz. at 580-81 ¶ 15. Our Supreme Court credited the superior court's conclusion that the prison environment made rehabilitation of the parent relationship extremely difficult, writing "maintaining a relationship with one's children while incarcerated would undoubtedly be a difficult task," but nonetheless reversed because it rejected the fatalism that difficulty or improbability excused DCS from supporting that difficult task in the first place. *Id.* at 581 ¶ 17. Our high court rejected "[t]he juvenile court's rationale and conclusion . . . [as] self-

fulfilling and impl[ying] that incarcerated parents could never adequately maintain" their parental relations with their children. *Id.* The court's invocation of futility in this case likewise renders Mother's anticipated failure to learn more about J.C.'s medical needs self-fulfilling. Just as that was impermissible in *Jessie D.*, so it should be here.

**¶56** The Arizona Supreme Court's articulation in *Jessie D.* of the legal rule makes even clearer that DCS cannot invoke futility here to excuse its failure to notify Mother of J.C.'s appointments. In the paragraph of *Jessie D.* announcing what DCS would be constitutionally required to do going forward, the court mandated rehabilitation services for *all* incarcerated parents seeking services and facing termination proceedings under A.R.S. § 8-533(B)(4), unless the court made a finding that the services themselves would endanger the child. *Id.* at 582 ¶ 21. *Jessie D.* concerned parents who the superior court and the Arizona Supreme Court agreed faced long odds against rehabilitating the parental relationship; it concerned a subpart of A.R.S. § 8-533, which, like (B)(2) here, did not contain any requirement of diligent efforts on DCS's part; and it announced a constitutional rule that rehabilitative efforts were required in *all* cases, save those when it would affirmatively injure the child. *See id.* This rule does not leave room for DCS to throw up its hands after the fact and claim Mother would not have improved in caring for her child's medical needs when Mother is clamoring to attend the child's medical appointments. *See also Santosky*, 455 U.S. at 753–54 ("If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.").

**¶57** It is likewise significant that in the four decades since the futility concept was articulated in our cases concerning termination under A.R.S. § 8-533, the Arizona Supreme Court has never relied on it to justify a termination under this statute. It is our job to follow the guidance of the Arizona Supreme Court. Between *Jessie D.*'s recent articulation of a clear constitutional rule lacking exceptions and a lack of case law employing futility since the U.S. Supreme Court issued *Santosky*, there is no reason to believe the Arizona Supreme Court would circumscribe Mother's rights by using the rubric of futility in this case.

**¶58** Additionally, the superior court's futility finding creates a further constitutional problem that defeats DCS's attempt to rely on it in this court. The fundamentals of due process are notice and an opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254 (1970). The right to services in aid of reunification is necessarily a right that the services occur

meaningfully in advance of the evidentiary hearing on termination under A.R.S. § 8-533. *See Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330 ¶ 22 (App. 2007) (explaining that relevant circumstances in termination are those existing at time of trial). As Mother notes, Arizona law has a formal process to justify the extraordinary step of revoking a parent's right to rehabilitative services. *See* A.R.S. § 8-846(D). As Mother also notes, DCS did not invoke that procedure here.

**¶59** But when DCS wishes to cease providing services to a parent facing a termination proceeding, the Legislature required several things of DCS that underscore that lack of notice and an opportunity to be heard in this case. DCS was required to make reasonable efforts to provide services to Mother and J.C. under A.R.S. § 8-846(A) unless three things occurred. First, DCS was required to ask the superior court for permission not to provide those services. Second, DCS was thus required to put Mother on notice that in a proceeding in which her parental rights could be terminated, DCS planned not to provide those services. Third, DCS was required to make showings by clear and convincing evidence of the presence of justifications not to provide services.

**¶60** Section 8-846 illustrates that in termination cases, both the federal Constitution and our Legislature's statutory design guarantee Arizona parents the fundamentals of due process, which are notice and an opportunity to be heard. The court's *post hoc* finding of futility in its order terminating Mother's parental rights – with no prior motion to the court, no notice to Mother that the state was renouncing an obligation it might have to her (to allow her to address the matter with the superior court *before* termination), and no clear and convincing evidence standard – failed to provide Mother with notice and an opportunity to be heard. *Holcomb v. Ariz. Dep't of Real Estate*, 247 Ariz. 439, 443 ¶ 11 (App. 2019) ("Procedural due process requires that a party receive notice and the opportunity to be heard at a meaningful time and in a meaningful manner."). Indeed, this court has previously explained that the design of A.R.S. § 8-846 is to do exactly this – to give notice to parents when DCS thinks services are futile, so they can resist that suggestion and be guided accordingly. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 237 ¶ 25 (App. 2011) ("Thus, when applicable under § 8-846, if ADES intends to stop providing reunification services, it is then obligated to bring the issue to the attention of the juvenile court to permit the parents to be heard on the matter."). Our Constitution and our Legislature's consistent design that Arizona parents receive notice when the state chooses to withdraw or not provide reasonable services, require more.

B.    **The Superior Court's Finding of Futility Was an Abuse of Discretion.**

**¶61**    The court's finding of futility here was also an abuse of discretion because it was not made by clear and convincing evidence, and because it rests on a foundational factual finding that was not made by clear and convincing evidence.  Our seminal case in advancing futility as a basis for not providing services calls for DCS to demonstrate by clear and convincing evidence that the services would have been futile.  *Mary Ellen C.*, 193 Ariz. at 193 ¶ 39 ("Nor did the State introduce clear and convincing evidence that additional services would have been futile.").  The court did not claim to have determined futility by clear and convincing evidence.  Indeed, by resting its finding that informing Mother of J.C.'s appointments would have been futile because it was "unlikely" she would have attended them, the court appears to have employed a preponderance of the evidence standard.  Even if one does not read the court's use of "unlikely" in that fashion, the fact remains that the futility finding was a but-for cause of termination and was not determined by clear and convincing evidence.  This was error.  *See No. JS-5209*, 143 Ariz. at 178, 185 ("[T]he clear and convincing evidence standard employed in parental termination cases[] serves to protect the parent's right from being too easily terminated based upon standards that may not be very precise.") (citing *Santosky*, 455 U.S. 745).

**¶62**    The finding of futility is likewise an abuse of discretion because the record does not support a finding by clear and convincing evidence.  It is not our province to reweigh the evidence.  *Jessie D.*, 251 Ariz. at 582 ¶ 23.  Nonetheless, there is an abuse of discretion here, where we must defer to the juvenile court's finding that "Mother at hearings and foster care review board meetings regularly requested to be advised of medical appointments so that she could participate in those appointments and understand the child's medical needs better."  This is precisely the conduct DCS required of Mother.  To find it was essentially impossible that Mother could improve as a parent and better understand J.C.'s medical needs when she was asking to do precisely what DCS wanted and needed her to do does not make sense and is an abuse of discretion.  Treating as irrelevant Mother's desire to do exactly what DCS's case plan required of her made DCS's refusal to provide the core assistance its case plan called for a "self-fulfilling" prophecy of Mother's failure.  *Compare Jessie D.*, 251 Ariz. at 581 ¶ 17 (reversing where juvenile court's rationale rendered outcome of proceeding "self-fulfilling" by declining to allow parent opportunity to attempt extremely difficult task of rebuilding parental relationship despite incarceration).

20

¶63        Mother is right that the court's *post hoc* futility finding, without DCS ever invoking A.R.S. § 8-846 or Arizona Rule of Procedure for the Juvenile Court 340 (allowing any party to "file a motion pursuant to A.R.S. § 8-846 asking the court to relieve DCS of the duty to provide reunification services) was a further abuse of discretion. The juvenile court misapplied the law when it determined in its final order that it would have been futile for DCS to invite Mother to J.C.'s medical and therapy appointments, where DCS failed to move for relief under and prove an aggravating circumstance under A.R.S. § 8-846 by clear and convincing evidence.

¶64        And as already noted, when DCS resolves not to provide services, it is "obligated to bring the issue to the attention of the juvenile court to permit the parents to be heard on the matter." *Christina G.*, 227 Ariz. at 237 ¶ 25. DCS did not do as this court indicated it must in *Christina G.*, which put the superior court unfairly at a disadvantage in managing this case. DCS chose not to notify Mother of J.C.'s appointments, and chose not to raise the matter to the juvenile court by motion. When it later mattered enough to require a futility finding after trial, DCS was properly chargeable under A.R.S. § 8-846 with its prior failure to raise the issue to the juvenile court, as Mother suggests.

¶65        There is likewise an abuse of discretion in the futility finding because its *post hoc* nature robbed Mother of the chance to avoid the superior court's after-the-fact ruling that she could never have learned, even if she had opportunities DCS failed to offer. J.C.'s medical and special needs were the central issue of the dependency. Indeed, J.C. had numerous ongoing appointments with several providers. By not inviting Mother, DCS denied her the time and opportunity to demonstrate her ability—or inability—to consistently attend appointments and to learn about and meet J.C.'s needs. *See Donald W.*, 247 Ariz. at 23 ¶ 51 (App. 2019) (DCS failed in its duty to provide services when its "lack of diligence at the onset created the circumstance" preventing reunification).

¶66        One answer to this critique is that while DCS failed to provide Mother with this core part of its case-management service, the juvenile court found it was "unlikely Mother would have participated" in the appointments and determined Mother "had abundant access to the child's medical history and records" from records of this court proceeding but "still had no idea what the child's various medical needs were" at trial. These are negative findings. But they were made in the world in which Mother was functionally disinvited by DCS from the appointments necessary for Mother to mount her disproof. DCS's inaction leaves a large void in the record, such that the court's futility finding is not supported by

clear and convincing evidence or a reasonable inference. And in any event, the juvenile court did not find these foundational facts by clear and convincing evidence: finding Mother's attendance at appointments "unlikely" doesn't show that fact "by clear and convincing evidence." *See Kent K.*, 210 Ariz at 284-85 ¶ 25 (explaining that "clear and convincing" means "highly probable or reasonably certain.").

**¶67** DCS's arguments in support of these findings are not persuasive. DCS points out Mother attended a few appointments through other relatives, but does not dispute its own failure to notify Mother of appointments while proceeding against her parenting rights on the theory that she needed to attend them and learn about J.C.'s medical needs. DCS asserts that "Mother . . . failed to engage in *any* of the numerous services that DCS provided to her . . ." But that is not the record. The superior court denied DCS's request for termination on the six-month out-of-home ground, affirmatively recognizing "Mother's more recent engagement" in services, and finding Mother had "not substantially neglected or willfully refused to participate in services." DCS's observation that "[a]s with all of the other service appointments, she just did not bother to attend them" likewise does not fairly reflect the record of this matter. True, Mother's participation in services was sporadic, but she began engaging more in the five months preceding trial. Mother's uneven participation must be measured against the choice to seek to revoke her constitutional right to parent J.C. while not notifying Mother of J.C.'s medical appointments. The law does not allow us to relieve DCS of the consequences of that choice. *See Jessie D.*, 251 Ariz. at 584 ¶ 34 (Bolick, J., concurring) ("I trust that in future cases, lower courts will require DCS to facilitate maintaining the parental relationship as it is constitutionally required to do, and that this Court will overturn termination orders where DCS fails to do so.").

**¶68** We should vacate the superior court's findings that DCS made a diligent effort to provide Mother with appropriate reunification services and that its failure to invite Mother to J.C.'s doctor and therapy appointments was futile. Because we should vacate these findings, there is no need to address Mother's challenge to the court's finding that severance was in J.C.'s best interests, so this dissent proceeds no further.

## CONCLUSION

**¶69** We should vacate the superior court's order terminating Mother's parental rights to her child J.C. and remand to direct the juvenile court to give her a chance to succeed or fail in learning about and caring for J.C.'s special medical needs. If she cannot, then termination would be proper. Until then, the United States Constitution, as elaborated in *Santosky*

and *Jessie D.*, guarantees Mother an opportunity to succeed or fail in learning about her child's special medical needs, and how to care for them. Declaring after a dependency and termination that it was futile to let Mother try at all is not consistent with those authorities.



AMY M. WOOD • Clerk of the Court
FILED:   AA